UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                  Case No. 8:21-cv-

ALL FUNDS PREVIOUSLY SEIZED
FROM BINANCE HOLDINGS LIMITED
ACCOUNT BEARING USER ID 39177039,
AND ASSOCIATED WITH THE EMAIL
ADDRESS **TANYAGLUSHKO99@GMAIL.COM**,

    Defendant.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America brings this complaint and alleges upon information and belief as follows:

### NATURE OF THE ACTION

1. This is a civil action in rem, to forfeit to the United States of America, all funds previously seized from Binance Holdings Limited account bearing User ID 39177039, and associated with the email address **tanyaglushko99@gmail.com** (the Defendant Property).

### VENUE AND JURISDICTION

2. Venue properly lies in the Middle District of Florida pursuant to 28 U.S.C. § 1395, because pertinent acts giving rise to the forfeiture action occurred in the Middle District of Florida.

3. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides the Court with jurisdiction over actions to recover or enforce forfeitures.

4. This Court has *in rem* jurisdiction over the Defendant Property because pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida. 28 U.S.C. § 1355(b)(1)(A).

5. Because the Defendant Property is in the government's possession, custody, and control, the United States requests that the Clerk of Court issue an arrest warrant *in rem,* upon the filing of the complaint, pursuant to Supplemental Rule G(3)(b)(1). The United States will then execute the warrant on the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## STATUTORY BASIS FOR FORFEITURE

6. The Defendant Property represents proceeds obtained, directly or indirectly, as a result of violations of 18 U.S.C. § 1030, and is, therefore, subject to civil forfeiture by the United States pursuant to 18 U.S.C. § 981(a)(1)(C). Section 981(a)(1)(C) provides for the civil forfeiture of any property which constitutes or is derived from proceeds from a violation of, among others, 18 U.S.C. § 1030.

7. Additionally, the Defendant Property constitutes property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956, or are traceable to such property and is, therefore, subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

8. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable believe that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable believe that the government will be able to show by a preponderance of the evidence that the Defendant Property is proceeds of violations of 18 U.S.C. § 1030, and property involved in money laundering.

9. The specific facts supporting the forfeiture of the Defendant Property have been provided by Daniel M. Sirmons, Special Agent of the Federal Bureau of Investigation (FBI).

## **FACTS**

10. Daniel M. Sirmons has been employed as a Special Agent with the FBI since February 1995. He is currently assigned to the FBI Field Office in Tampa, Florida. He earned a Bachelor of Science in Electrical Engineering from the University of South Florida in 1988. He as attended over 500 hours of training in various aspects of criminal investigations and cyber-related technical training. In his capacity as an FBI Special Agent, he has conducted investigations into both criminal and national security matters, focusing on violent crime, narcotics, counterterrorism, counterintelligence, computer intrusions, and cybercrimes to include those involving cryptocurrency to facilitate wire fraud, computer fraud, mail fraud, and money laundering. He has also assisted in the execution of numerous search warrants, resulting in the seizure of paper, electronic, and other forms of evidence.

11. SA Sirmons has received significant training on how people use computers to commit crimes and the law enforcement techniques that can be utilized to investigate and disrupt such activity. He has also been involved in, among other things, online and in-person undercover operations, as well as controlled drug deliveries and transactions. Moreover, in the course of his investigations and other cases on which he has worked, he has gained experience executing search warrants for physical premises, as well as for electronic evidence, such as the content and other data associated with email, messenger, financial, and digital-marketplace accounts operating on both the traditional Internet and the dark web.

12. The information SA Sirmons has provided is based upon his personal knowledge, his review of documents and other evidence, his conversations with other law enforcement personnel, and his training and experience concerning the use of computers in criminal activity and the forensic analysis of electronically stored information.

## BACKGROUND ON CRYPTOCURRENCIES AND TRANSACTION ANALYSIS

13. Bitcoin[1] is a type of virtual currency, circulated over the Internet. Bitcoin are not issued by any government, bank, or company, but rather are

---

[1] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here.

controlled through computer software operating via a decentralized, peer-to-peer network.

14. Bitcoin can be exchanged directly, person to person, through a cryptocurrency exchange, or through other intermediaries. Bitcoin are sent and received from Bitcoin "addresses." A Bitcoin address is somewhat analogous to a bank account number and is represented as a 26-to-35-character-long case-sensitive string of letters and numbers. Each Bitcoin address is controlled through the use of a unique corresponding private key. This key is the cryptographic equivalent of a password, or pin, and is necessary to access the Bitcoin address. Only the holder of an address's private key can authorize any transfers of bitcoin from that address to other Bitcoin addresses. The individual or entity who holds the private key for a Bitcoin address is therefore considered the "owner" of the address. Users can operate multiple Bitcoin addresses at any given time and may use a unique Bitcoin address for each and every transaction. Users often combine multiple Bitcoin addresses (and their corresponding private keys) in a single logical unit known as a Bitcoin "wallet."

15. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is often used by individuals and organizations for criminal purposes, such as money laundering. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track proceeds of illicit activities. Although it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and financial systems.

16. While a Bitcoin address itself does not generally reveal the address's owner (unless the owner opts to make information about the owner's Bitcoin address publicly available), the Bitcoin blockchain is an open, distributed ledger that records transactions of bitcoin between two addresses efficiently and in a verifiable and permanent way. Investigators can sometimes use the blockchain to identify the owner of a particular Bitcoin address or identify Bitcoin addresses that likely all belong to the same owner. For example, because the blockchain serves as a searchable public ledger of every Bitcoin transaction, investigators can trace transactions to other Bitcoin addresses, including Bitcoin exchanges and Bitcoin payment processors.

17. Investigators may cluster Bitcoin addresses believed to be held by the same owner for the purposes of blockchain analysis into a single "merge wallet." Two ways that analysts determine that multiple addresses are likely under the control of the same owner are called "co-spending" and "change address analysis." "Co-spending" is when a number of Bitcoin addresses are all used to send bitcoin in a single transaction. This indicates that a single owner holds the private keys for all those addresses. "Change address analysis" identifies addresses operating as "change addresses" for a particular account owner. Each bitcoin transaction requires that all the bitcoin at a given address be sent to new addresses. If the owner of the bitcoin wants to spend less than the complete amount of bitcoin held at one of their addresses, they send the excess bitcoin to a new address for which they also hold the

private key, called a "change address." Change addresses are therefore likely held by the same owner as the original Bitcoin address.

18.     Bitcoin is just one of many varieties of virtual currency. TetherUS, also referred to as Tether, is a cryptocurrency purportedly backed by the United States dollars. Tether was originally designed to always be worth $1, and the company responsible for issuing Tether purportedly maintained $1 in reserves for each Tether issued.

## BACKGROUND ON BINANCE

19.     Binance Holdings Limited ("Binance"), which is registered in the Cayman Islands, owns and operates Binance.com, a cryptocurrency exchange that provides a platform for trading various cryptocurrencies and exchanging cryptocurrencies for fiat currencies. Binance is one of the largest cryptocurrency exchanges in the world in terms of trading volume. Among other services, Binance provides customers with "custodial wallets," meaning that Binance maintains the private keys relating to the customer's cryptocurrency and therefore has complete control over client funds. Binance offers its services to customers around the world, including the United States.

20.     Customers use exchanges like Binance to trade one form of digital currency for another, such as exchanging bitcoin for Tether, or to exchange digital currency into fiat money. In my training, knowledge, and experience, ransomware

attackers frequently use cryptocurrency exchanges such as Binance to launder or obfuscate their illicit gains.

## SUMMARY OF INVESTIGATION

21.     Ransomware is a type of malware that compromises a victim's computer network and threatens to withhold access to and/or publish victim data unless a ransom is paid. Beginning in approximately August 2019, and continuing to the present, victims in the United States and around the world, including within the Middle District of Florida, have been victimized by ransomware identified as "NetWalker." To date, the ransomware has been deployed on dozens of victims, including municipalities, hospitals, law enforcement and emergency services, school districts, colleges, and universities. NetWalker is capable of not only encrypting victim data and making it inaccessible to the victim, but also stealing victim data. If a victim does not pay the ransom, the stolen data is often published. To date, NetWalker attacks have resulted in the payment of millions of dollars in ransoms. Due to the global scale of these crimes, multiple domestic and foreign law enforcement agencies are conducting parallel investigations of the actors responsible for NetWalker.

22.     NetWalker uses a ransomware-as-a-service model, featuring developers and affiliates (collectively, the "NetWalker Actors"). Developers are responsible for creating and updating the ransomware, and making it available to affiliates. Affiliates

are responsible for identifying and attacking high-value victims with the ransomware. After a victim pays, developers and affiliates split the ransom.

23. Once a victim's computer network is compromised and the data is encrypted, the NetWalker Actors deliver a file, or ransom note, to the victim. Below, a representative ransom note has been recreated in part:

> Hi! Your files are encrypted by Netwalker . . . If for some reason you read this text before the encryption ended, this can be understood by the fact that the computer slows down, and your heart rate has increased due to the ability to turn it off, then we recommend that you move away from the computer and accept that you have been compromised. Rebooting/shutdown will cause you to lose files without the possibility of recovery . . . Our encryption algorithms are very strong and your files are very well protected, the only way to get your files back is to cooperate with us and get the decrypter program. Do not try to recover your files without a decrypter program, you may damage them and then they will be impossible to recover. For us this is just business.

24. The ransom note also provides the victim with a unique code and the URL to the NetWalker Actors's Tor website.[2] After entering the code on the website, the NetWalker Actors provide the victim with the amount of ransom demanded and instructions for payment. The NetWalker Actors and victim can communicate directly with one another on the Tor website.

---

[2] The Onion Router ("Tor") is a network of computers distributed around the world designed to conceal the true IP addresses of the network's users. The Tor network also enables websites to operate in a manner that conceals the true IP address of the server hosting the website.

9

25. The NetWalker Actors commonly gain unauthorized access to a victim's computer network days or weeks prior to the delivery of the ransom note. During this time, the NetWalker Actors surreptitiously elevate their privileges within the network while spreading the ransomware from workstation to workstation. The NetWalker Actors send the ransom note only once they are satisfied that they have sufficiently infiltrated the victim's network to extort payment.

26. In or about May 2020, the NetWalker ransomware was deployed on a U.S. based company ("Victim Company A"). Victim Company A was only able to regain access to its critical data after paying 37.58 bitcoin in ransom, or approximately $353,900.46 on the date of transfer. On May 30, 2020, at 20:15, Coordinated Universal Time (UTC), Victim Company A paid the 37.58 bitcoin ransom to a single bitcoin wallet.  Analysis of the bitcoin blockchain indicates that approximately 30 minutes later, at 20:44 UTC, this bitcoin wallet sent the entirety of those funds to four bitcoin addresses, including "Merge E" and "Wallet A", in a single transaction. Specifically, 30.07 bitcoin was sent to the group of addresses identified as "Merge E" on Exhibit 1, and 1.88 bitcoin was sent to the address identified as "Wallet A" on Exhibit 1. Based on change address analysis and co-spending, investigators believe that the addresses located at Merge E are controlled by the same owners.  Investigators were unable to determine if the two addresses receiving the small, remaining balance of the ransom funds were controlled by the same owners.

27. In or about June 2020, the NetWalker ransomware was deployed on a second U.S. based company ("Victim Company B"). Victim Company B was only able to regain access to its critical data after paying 106.168 bitcoin in ransom, or approximately $999,094.54 on the date of transfer. On June 2, 2020, at 21:23 UTC, Victim Company B paid the 106.168 bitcoin ransom to a single bitcoin wallet. Analysis of the bitcoin blockchain indicates that approximately 30 minutes later, at 21:53 UTC, this bitcoin wallet sent the entirety of those funds to four bitcoin addresses, including Merge E and Wallet A, in a single transaction. Specifically, 89.18 bitcoin was sent to Merge E, and 4.25 bitcoin was sent to Wallet A. Investigators were unable to determine if the two addresses receiving the small, remaining balance of the ransom funds were controlled by the same owners.

28. In or about June 2020, the NetWalker ransomware was also deployed on a third U.S. based company ("Victim Company C"). Victim Company C was only able to regain access to its critical data after paying 303.651 bitcoin in ransom, or approximately $2,860,432.30 on the date of transfer. On June 8, 2020, at 17:27 UTC, Victim Company C paid the 303.651 bitcoin ransom to a single bitcoin wallet. Analysis of the bitcoin blockchain indicates that approximately 30 minutes later, at 17:53 UTC, this bitcoin wallet sent the entirety of those funds to four bitcoin addresses, including Merge E and Wallet A, in a single transaction. Specifically, 255.07 bitcoin was sent to Merge E, and 12.15 bitcoin was sent to Wallet A. Once again, investigators were unable to determine if the two addresses receiving the small, remaining balance of the ransom funds were controlled by the same owners.

29.     As described below, from June 6 to 22, 2020, Merge E and Wallet A engaged in a series of rapid transfers that are consistent with efforts taken to conceal the nature and source of the illicit funds. On June 6, 2020, at 11:59 UTC, Merge E sent two transactions totaling 29.48 bitcoin to a group of addresses identified as "Merge F" on Exhibit 1. Based on change address analysis and co-spending, investigators believe that the addresses located at Merge F are controlled by the same owners. Approximately four hours later, at 14:03 UTC, Merge F sent two transactions totaling 8.89 bitcoin to a group of bitcoin addresses identified as "Merge G" on Exhibit 1. Again, based on change address analysis and co-spending, investigators believe that Merge G is controlled by the same owners.

30.     Similarly, on June 11, 2020, at 07:19 UTC, Wallet A sent seven bitcoin to a single address identified as "Wallet B" on Exhibit 1. Approximately seven hours later, at 14:57 UTC, Wallet B sent 4.7 bitcoin to a single address identified as "Wallet C" on Exhibit 1. On June 22, 2020, at 13:59 UTC, Wallet C sent 1.66 bitcoin to a single address identified as "Wallet D" on Exhibit 1. Approximately ten minutes later, at 14:10 UTC, Wallet D sent 1.48 bitcoin to Merge G.

31.     As described above, Merge G was the recipient of ransom payments made by Victim Company A, Victim Company B, and Victim Company C. From June 7-22, 2020, Merge G made three deposits totaling $172,281.22 directly into an account at Binance Holdings Limited, bearing User ID 39177039 and associated with the email address tanyaglushko99@gmail.com (the Target Binance Account). On June 7, 2020, at 10:24 UTC, Merge G sent 8.879 bitcoin to the Target Binance

Account. On June 22, 2020, at approximately 15:09 UTC, Merge G sent five bitcoin to the Target Binance Account. Minutes later, at 15:15 UTC, Merge G sent an additional 4.4 bitcoin to the Target Binance Account. The anonymity provided by bitcoin, coupled with the series of rapid transfers following the initial transfer of the victim's ransom payments to the NetWalker payment addresses are consistent with efforts taken to conceal the nature and source of the illicit funds.

32. Binance records revealed that the Target Binance Account is registered to a 20-year-old Ukrainian national named Tetiana Lukianiuk. These records indicate that between January 30, 2020, and June 22, 2020, Lukianiuk exchanged the majority of bitcoin in the Target Binance Account for Tether. As of June 25, 2020, the Target Binance Account held two cryptocurrency assets, bitcoin and Tether, valued at approximately $433,271.39.

33. Pursuant to a seizure warrant signed on July 10, 2020, by United States Magistrate Judge Amanda Arnold Sansone, Case No. 8:20-mj-1668AAS, the cryptocurrency remaining in the Target Binance Account, valued at approximately $454,530.19, was transferred to a wallet owned and controlled by the FBI.

## CONCLUSION

34. As required by Supplemental Rule G(2)(f), the facts set forth herein support a reasonable believe that the government will be able to meet its burden of proof at trial. Specifically, probable cause exists to believe that the Defendant Property is proceeds of violations of 18 U.S.C. § 1030, and property involved in money laundering offenses, and is therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(C).

Dated: February 19th, 2021

Respectfully submitted,

MARIA CHAPA LOPEZ,
United States Attorney

By: _____
Suzanne C. Nebesky
Assistant United States Attorney
Florida Bar No. 59377
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: (813) 274-6000
E-mail: suzanne.nebesky@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Daniel M. Sirmons, declare under penalty of perjury that:

I am a Special Agent with the Federal Bureau of Investigation. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 19 day of February, 2021.

*Daniel M. Sirmons*
Daniel M. Sirmons, Special Agent
Federal Bureau of Investigation